# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REID ELEY,

        Plaintiff,

        v.

DISTRICT OF COLUMBIA,

        Defendant.

Civil Action No. 14-319 (BAH)(JMF)

Judge Beryl A. Howell

## MEMORANDUM OPINION

The plaintiff, Reid Eley, a special-education eligible student residing in the District of Columbia, is before this Court for the third time in the last three years in his ongoing fight to obtain a free appropriate public education, as guaranteed by the Individuals with Disabilities Education Act ("IDEA"),[1] 20 U.S.C. §§ 1400 *et seq.* *See Eley v. District of Columbia* (*Eley II*), 2013 U.S. Dist. LEXIS 164995, at *1 (D.D.C. Nov. 20, 2013); *Eley v. District of Columbia* (*Eley I*), No. 11-309, 2012 WL 3656471, at *1 (D.D.C. Aug. 24, 2012). This time, the plaintiff is asserting his rights under 20 U.S.C. § 1415(j), the "stay-put" provision of the IDEA, to maintain his current educational placement during the resolution of the underlying appeal in this case. *See* Pl.'s Mot. Automatic "Stay-Put" Preliminary Inj. ("Pl.'s Mot.") at 1, ECF No. 9. As in the previous two cases, the defendant, the District of Columbia, opposes the plaintiff's request for relief and, once again, the Court grants the plaintiff's motion.

---

[1] The Individuals with Disabilities Education Improvement Act ("IDEIA") was enacted in 2004 to reauthorize and the IDEA, *see* Pub. L. No. 108-446, 118 Stat. 2647 (Dec. 3, 2004) (effective July 1, 2005), but the short title continues to state that the law may be cited as the "Individuals with Disabilities Education Act," 20 U.S.C. § 1400(a), which is the reference used in this opinion.

## I. BACKGROUND

Following remand after this Court issued its decision in *Eley I*, this matter was brought before a District of Columbia Hearing Officer "for the sole purpose of determining whether the $2,850 sought by the plaintiff as reimbursement [for private school tuition] is appropriate and reasonable." *Eley I*, 2012 WL 3656471, at *1. On November 21, 2012, a hearing officer found that the plaintiff was entitled to $2,850. *See* Pl.'s Mot. Ex. 1 (Hearing Officer Determination ("HOD") (Nov. 21, 2012)) at 8, ECF No. 9-1. Far from ending the dispute between the parties, the handling of the plaintiff's education by the defendant prompted the plaintiff to file multiple due process complaints against the defendant over the next year and a half.

Despite the clear instruction in *Eley I* that the defendant should "prepar[e] . . . an IEP for the 2012–13 school year" and address whether TLCIS should be the plaintiff's prospective placement "as soon as possible," 2012 WL 3656471, at *11, the defendant failed to re-evaluate the plaintiff or provide a location where he could receive educational services for the 2012-2013 school year, prompting the plaintiff's first[2] Administrative Due Process Complaint, filed February 21, 2013, *see* Pl.'s Mot. Ex. 2 (HOD (May 1, 2013)) at 1, ECF No. 9-1. On May 1, 2013, the hearing officer found that the defendant "denied Student a FAPE by failing to assign Student an educational placement for SY [school year] 2012/13, failing to provide Student with an appropriate annual [Individualized Education Plan ("IEP")] for SY 2012/13, and failing to reevaluate Student since February of 2011." *Id.* at 12. The defendant was ordered to (1) convene a multidisciplinary team to "(i) review and revise, as appropriate, Student's IEP, and (ii) assign Student an educational placement where his IEP can be implemented for SY 2013/14 and

---

[2] To aid in understanding the somewhat complicated procedural history in this matter, the due process complaints are numbered in chronological order using the Court's decision in *Eley I* as a starting point. Hence, the "first" due process complaint refers to the first due process complaint filed by the plaintiff since the decision was rendered in *Eley I*. The plaintiff had, of course, filed due process complaints previous to *Eley I* that were fully resolved by the *Eley I* decision. *See generally Eley I.*

for Summer 2013 ESY [Extended School Year] if appropriate[,]" *id.* at 12; (2) provide funding

for the plaintiff's "specialized instruction through his current private provider," i.e., TLCIS,

"through the end of SY 2012/13[,]" *id.* at 13; (3) re-evaluate the plaintiff as required by 34 CFR

§ 300.303(b)(2), *id.* at 11; and (4) provide certain equipment and reimbursements as a

"compensatory award[,]" *id.* at 13.

In accordance with the May 1, 2013 HOD, the plaintiff's IEP team met on May 14, 2013

to develop a new IEP. Pl.'s Mot. Ex. 3 (HOD (July 26, 2013)) at 6–7, ECF No. 9-1. A final IEP

was produced based on this meeting and subsequent communications between the parties, on

May 28, 2013.[3] *Id.* This IEP called for the plaintiff to receive just over thirty-three hours of

specialized services per week. *See id.* at 7–8. It did not "identify the location of services where

[the plaintiff's] special education related services will be provided for either ESY or the 2013-14

school year." *Id.* at 8. Thus, left undone was the portion of the May 1, 2013 HOD requiring the

defendant to assign an "educational placement," i.e., a location for educational services to be

provided, for the next school year, 2013-2014.

In June 2013, the defendant's "Location of Services team" met without the plaintiff, who

was not invited to participate. *Id.* at 8–9. The defendant "determined that the ESY program [for

Summer 2013] at [Eastern Senior High School] would be able to implement [the plaintiff's] ESY

program." *See id.* On June 7, 2013, prior to the plaintiff being notified of the location of his

ESY services, the plaintiff's mother filed her second due process complaint against the defendant

alleging, *inter alia*, that the defendant failed to provide the plaintiff with a Free Appropriate

Public Education ("FAPE") by failing to comply with the May 1, 2013 HOD to provide an

---

[3] Although the IEP is dated "May 24, 2013," the parties stipulated at the oral hearing on this motion that the correct date when this IEP was finalized is May 28, 2013. *See* Pl.'s Reply Re: "Stay-Put" Prelim. Inj. ("Pl.'s Reply") at 1 n.1; 13 n.8, ECF No. 12. For ease of reference, the Court refers to this IEP, which the parties agree is the last operative IEP, *see* Def.'s Opp'n at 5, Pl.'s Reply at 1, as the May 2013 IEP.

appropriate IEP. *See id.* at 1–2. In a July 26, 2013 HOD, the hearing officer found that the plaintiff's mother had "not met her burden of proof to establish that the May 28, 2013 IEP was deficient . . . or that the IEP was not reasonably calculated to provide [the plaintiff] educational benefits." *Id.* at 21.[4] Nevertheless, the HOD found that Eastern Senior High School was "not a location capable of implementing [the plaintiff's] ESY requirement for 1:1 instruction." *Id.* at 24. Therefore, the defendant was ordered to fund sixty hours of "1:1 instruction of [the plaintiff] by [TLCIS] . . . to be completed before the end of [D.C. Public Schools'] summer break." *Id.* at 26.

On August 26, 2013, the plaintiff's mother filed a third due process complaint against the defendant, alleging that the defendant "failed to provide the [plaintiff] any school for the student to attend for SY 2013-2014." Pl.'s Mot. Ex. 4 (HOD (Nov. 9, 2013)) at 3, ECF No. 9-1. In an HOD issued on November 9, 2013, the hearing officer found that the plaintiff's mother "sustained the burden of proof by a preponderance of the evidence that [the defendant] was to propose and [sic] educational placement for the [plaintiff] for SY 2013-2014 and failed to do [so] and thereby denied the [plaintiff] a FAPE." *Id.* at 7. The November 9, 2013 HOD ordered the defendant to continue to fund the plaintiff at TLCIS for "up to 160 hours of instruction . . . that shall be completed by . . . January 31, 2014" as well as necessary transportation. *Id.* at 8. The HOD also ordered the defendant to "within ten school days of the issuance of [the November 9, 2013 HOD], convene and the parent shall attend an IEP meeting to review the student's most recent evaluation(s) and review and update the student's IEP as appropriate and propose a placement and location to implement the IEP for the remainder of SY 2013-2014." *Id.* at 9. The

---

[4] Among the challenges raised by the plaintiff's mother was the failure to provide a location for services in the IEP for the 2013-2014 school year. *See* Pl.'s Mot. Ex. 3 at 19–20. The HOD found that this failure was excusable, but noted that "the [U.S. District Court] decision leaves no doubt that [the defendant] would have a duty to identify an appropriate location of services in time for [the plaintiff] to enroll before the beginning of the 2013-14 school year." *Id.* at 20 n.8.

plaintiff's parent was ordered to "make all reasonable and prompt efforts to comply with any request(s) that the [plaintiff] visit the proposed location of services." *Id.* Notably, in an appendix to the November 9, 2013 HOD, TLCIS was identified as the plaintiff's "most recent educational placement during SY 2012-2013." *Id.* at 12.

On December 6, 2013, the plaintiff's mother filed her fourth due process complaint against the defendant, alleging that the defendant "denied [the plaintiff] a . . . . FAPE by failing to identify a school for [the plaintiff] to attend . . . and by not following IDEA procedures in making changes to [the plaintiff's] IEP in September 2013."[5] Administrative Record ("AR") at 344–45.[6] During the pendency of that administrative proceeding, on January 29, 2014, the defendant issued a new IEP for the plaintiff after a meeting at which the plaintiff and the plaintiff's mother were not present. *See* Pl.'s Mot. Ex. 6 (IEP (Jan. 29, 2014)) at 1, ECF No. 9-1. On February 3, 2014 the plaintiff filed a fifth due process complaint against the defendant, alleging, *inter alia*, that the plaintiff was not properly re-evaluated as required by the prior HODs before the issuance of the new IEP; the new IEP included inappropriate changes to the plaintiff's "prescribed hours of instruction and services and his instructional setting and mode"; and, yet again, the new IEP did "not identify a location" for implementation. *See* Pl.'s Mot. Ex. 11 (Due Process Compl. Not. (Feb. 3, 2014)) at 1–2, ECF No. 9-1.

The administrative hearing on the plaintiff's fourth, December 6, 2013 complaint was held on February 4, 2014. *See* Pl.'s Mot. Ex. 5 (Hrg. Tr. (Feb. 4, 2014)) at 1, ECF No. 9-1. In a letter dated the next day, February 5, 2014—more than halfway through the 2013-2014 school year—the defendant notified the plaintiff that "[n]o changes to [his] IEP [were] being proposed

---

[5] This second claim "was withdrawn, after [the defendant's] representative testified at the [February 4, 2014] due process hearing that the September 2013 IEP was only a draft document for discussion and was never finalized." AR at 348.

[6] References to page numbers in the AR correspond to the "Bates" stamp number on each page of the AR.

at [the] time" and that "[t]he location of services for IEP implementation for [him] for the remainder of the 2013-2014 school year [was], High Road Academy of Washington, D.C." Pl.'s Mot. Ex. 12 (Letter from defendant to plaintiff (Feb. 5, 2014)) at 1, ECF No. 9-1.

The hearing officer issued an HOD on February 16, 2014,[7] denying the plaintiff's fourth due process complaint, finding that any delay in the defendant's identification of a school for the plaintiff to attend was the fault of the plaintiff. *See* AR at 372–73. The instant matter was filed with this Court on February 27, 2014, appealing from the February 16, 2014 HOD. *See* Compl. ¶¶ 3, 11–14, ECF No. 1.[8]

The plaintiff filed the instant motion for injunctive relief on April 6, 2014, exercising his stay-put rights under 20 U.S.C. § 1415(j). *See* Pl.'s Mot. at 1. The plaintiff seeks an injunction requiring the defendant to "fund the provision of all of the instruction and related services prescribed in [the plaintiff's] May 2013 IEP, at TLCIS at their customary rates, until the IDEA proceedings regarding [the plaintiff's] placement have concluded." Pl.'s Mem. Supp. Pl.'s Mot. ("Pl.'s Mem.") at 8, ECF No. 9.

## II.    LEGAL STANDARD

Section 1415(j) states that, except in certain circumstances inapplicable to the plaintiff here, "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j). By its terms, this procedural safeguard, commonly known as the "stay-put" provision, "functions, in essence, as an

---

[7] The HOD is dated February 16, 2013, which is clearly a typographical error. *See* AR at 373.
[8] On February 25, 2014, the plaintiff filed a sixth due process complaint against the defendant, alleging a "[p]rocedurally illegal determination of school location and placement"; "inappropriate school location and placement"; and "failure to provide instruction and services." Pl.'s Mot. Ex. 13 (Due Process Compl. Not. (Feb. 25, 2014)) at 1, ECF No. 9-1. The matters raised in that Due Process Complaint, as well as the first, second, third, and fifth Due Process Complaints, are not before this Court.

automatic preliminary injunction." *Drinker by Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 864 (3d Cir. 1996) (discussing the identical IDEA provision when it was codified at 20 U.S.C. § 1415(e)(3)); *see also Laster v. District of Columbia*, 439 F. Supp. 2d 93, 98–99 (D.D.C. 2006) (collecting cases and noting "courts have consistently interpreted the stay-put provision to be an automatic injunction."). The stay-put provision is among the "various procedural safeguards" established by the IDEA to "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Honig v. Doe*, 484 U.S. 305, 311–312 (1988). The Supreme Court explained in *Honig,* that the "unequivocal" language of this provision shows "that Congress very much meant to strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students, from school," pending completion of the review proceedings. *Id*. at 323 (emphasis in original); *see Flour Bluff Indep. Sch. Dist. v. Katherine M. by Lesa T.*, 91 F.3d 689, 695 (5th Cir. 1996) ("One of the obvious purposes of the 'stay-put' provision is to reduce the chance of a child being bounced from one school to another, only to have the location changed again by an appellate court.").

In evaluating requests for injunctive relief under the stay-put provision, the traditional four-part test for a preliminary injunction does not apply. *See Andersen by Andersen v. District of Columbia*, 877 F.2d 1018, 1023–24 (D.C. Cir. 1989) (noting that "if the [stay-put] provision applies, injunctive relief is available without the traditional showing of irreparable harm"); *see also District of Columbia v. Vinyard*, 901 F. Supp. 2d 77, 84 (D.D.C. 2012) (finding a school's "unilateral change to that [current educational] placement" entitles movants to "enforcement of their stay-put rights pursuant to § 1415(j), irrespective of their ability to demonstrate irreparable harm, likelihood of success on the merits, or a balancing of equities in their favor"); *Alston v.*

*District of Columbia*, 439 F. Supp. 2d 86, 91 (D.D.C. 2006) ("The traditional four-part standard for injunctive relief, however, does not apply in the present case because 'the stay-put provision has been interpreted as imposing an automatic statutory injunction.'") (quoting *Casey K. ex rel. Norman K. v. St. Anne Cmty. High Sch. Dist. No. 302*, 400 F.3d 508, 511 (7th Cir. 2005) (comparing stay-put injunction to automatic stay in a bankruptcy case) (citing *Honig v. Doe*, 484 U.S. at 326–37)).  Rather, the movant invoking the stay-put provision must show that (1) proceedings under the IDEA are pending; and (2) prevention of a change in the "then-current educational placement" of the child is sought.  *See* 20 U.S.C. § 1415(j); *Moore v. District of Columbia*, No. 09-656, 2009 U.S. Dist. LEXIS 34349, at *1 (D.D.C. Apr. 22, 2009).  Upon meeting this two-part inquiry, the movant is presumptively entitled to a stay-put injunction in favor of the child's current placement.

## III.    DISCUSSION

The parties agree that the first prong of the two-step test for application of the stay-put presumption has been met: that there is a pending IDEA action that has been appealed.  *See* Def.'s Opp'n Pl.'s Mot. ("Def.'s Opp'n") at 4, ECF No. 10 ("For purposes of this motion, the [defendant] acknowledges that there is an action pending, which is the instant appeal.").  The defendant disputes, however, that removing the plaintiff from the private school from which he has been receiving instruction since the 2010-2011 school year and placement in a new private school with different teachers in a different environment constitutes a change in the plaintiff's "then-current educational placement."  *See id.* at 5.  Alternatively, the defendant asserts that even if the proposed move were a change in the plaintiff's "then-current education placement," application of the traditional four-factor preliminary injunction test "warrants a different result" than staying put, which is the relief sought by the plaintiff.  *Id.* at 17.

The Court begins by addressing the contested second prong of the stay-put injunction presumption before turning to the defendant's alternate ground for denial of the requested injunctive relief.

**A.    Moving This Plaintiff To A New School Is A Change In His "Then-Current Educational Placement"**

In opposing the plaintiff's request for a stay-put injunction, the defendant protests that it "is not seeking to change Plaintiff's current educational placement," Def.'s Opp'n at 5, and, absent such a change, the plaintiff is not entitled to relief under § 1415(j). The defendant's opposition raises two questions: first, whether a change in the student's "then-current educational placement," under § 1415(j), can occur when a student is assigned to a different school where the same IEP can be implemented? Second, in light of that analysis, whether, in the circumstances of this case, the defendant's proposed move of the plaintiff from TLCIS to High Road Academy amounts to such a change, triggering the stay-put injunction? Contrary to the defendant's position, the Court answers both these questions affirmatively.

**1.    *The Meaning of "Then-Current Educational Placement" In The IDEA's Stay-Put Provision***

The parties in this case starkly differ in their interpretation of the term "then-current educational placement." The plaintiff contends that the phrase "educational placement," "includes an actual, physical school." Pl.'s Reply Re: "Stay-Put" Prelim. Inj. ("Pl.'s Reply") at 9, ECF No. 12. The defendant, on the other hand, contends that the plaintiff's "then-current educational placement" refers to his IEP *only*, without regard to the location at which the services required by the IEP are provided. *See* Def.'s Opp'n. at 5. As the defendant explains, "ensuring that the student's IEP is implemented at High Road Academy of Washington D.C. is a proposed change in *location of service* designed to ensure IEP implementation and compliance with the IDEA, not a proposed change in educational placement." *Id.* (emphasis in original).

Therefore, according to defendant, the designation of a location that can implement the plaintiff's IEP, regardless of whether the plaintiff has ever attended school at that location—or that such a school has been found capable of implementing the plaintiff's IEP—does not amount to a change in educational placement triggering the stay-put provision. *See id.* (stating that the "[d]efendant is not seeking to change Plaintiff's current educational placement" since educational placement is the plaintiff's IEP). The defendant's rigid definition cannot be reconciled with the plan language definition of the term "placement," the contextual meaning of the term "educational placement" within § 1415, or binding precedent.

a)      *The Plain Language Definition Of Placement*

The IDEA does not define the key term in the stay-put provision of "then-current educational placement." *See* 20 U.S.C. § 1401. Indeed, the IDEA does not define the term "placement," or what distinguishes a general "educational placement" from the "then-current educational placement" referred to in § 1415(j). *See id.* Absent a specific statutory definition, courts "construe [terms] in accordance with [their] ordinary meaning." *Octane Fitness, LLC v. ICON Health & Fitness Inc.*, 134 S. Ct. 1749, 1756 (2014) (internal quotation marks and citation omitted); *see Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 400 (D.C. Cir. 2004) ("[W]e begin with a 'plain language' analysis of the statutory text. That is, we assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.'" (quoting *Sec. Indus. Ass'n v. Bd. of Governors*, 468 U.S. 137, 149 (1984)).

The word "placement" is defined as "an act or instance of placing" or "the assignment of a person to a suitable place (as a job or a class in school)." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 888 (10th Ed. 1999). "Placing," in turn, is defined as "to put in or as if in a particular place or position," and "place" is defined as "a physical environment." *Id.* at 887, 888.

Thus, in ordinary parlance, "educational placement" would appear to be that "place" where a person is "assign[ed]" to receive educational services, or the "physical environment" where educational services are provided. *See id.*; *see also* Pl.'s Reply at 7 n.5 ("The common usage of 'placement' that comes closest to the one proposed by the [defendant] is the usage in 'job placement' . . . . A job placement is an actual job for an actual, identified institution."). This construction includes, implicitly or explicitly, a suggestion of a physical environment or location at which something exists or is to be performed. Thus, the plain language of the term "educational placement" certainly does not exclude reference to a physical location, as the defendant's focus on the goals of the IEP only would suggest. *See* Def.'s Opp'n at 5.

> b)    *The Contextual Meaning Of Educational Placement*

Outside of the plain meaning of words in a statute, courts may also derive meaning from the context of a statute since "Congress remains free, as always, to give [a] word a broader or different meaning" than the one suggested by the words' plain meaning. *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1707 (2012). When the reading of a word in a manner suggested "would lead to an absurd result Congress could not plausibly have intended," the statutory context becomes particularly important. *See id.* (citing *Clinton v. City of New York*, 524 U.S. 417, 429 (1998) (internal quotation marks omitted)). Courts "normally presume that . . . words . . . carry the same meaning when they appear in different but related sections" of the same statute. *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1362 (2013) (citation omitted); *see Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 342 (1994) (stating "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning" (internal quotation marks and citation omitted)).

The word "placement" appears in § 1415, apart from the stay-put provision in subsection (j), at least twenty-one times. *See* 20 U.S.C. § 1415. The phrase "then-current educational placement" occurs only once, in the stay-put provision itself. *See id.* Elsewhere in § 1415, the context of the word "placement" would lead to an absurd result if it were not meant to refer to a particular location. For instance, § 1415(d)(2)(H) refers to "requirements for unilateral placement by parents of children in private schools at public expense." If the defendant's interpretation were correct, and educational placement refers *only* to the IEP, § 1415(d)(2)(H) would be meaningless, since parents cannot create a "unilateral" IEP that requires a child to attend "private schools at public expense." The plain meaning of the term "placement" as encompassing physical location, however, fits perfectly in § 1415(d)(2)(H). Using that definition, "placement" would refer to the location at which an IEP was to be implemented, as unilaterally selected by the parents, instead of in the collaborative process envisioned by the IDEA. *See* 20 U.S.C. § 1415(d)(2)(H).

An examination of other subsections in § 1415 confirms the plain meaning of the term "placement." For example, the IDEA carves out a single exception to the stay-put provision in a section titled "Placement in alternative educational setting," which is codified at 20 U.S.C. § 1415(k). *See* 20 U.S.C. § 1415(j) (stating stay put provision applies "[e]xcept as provided in subsection (k)(4)"). Section 1415(k) authorizes school officials to "remove a child with a disability who violates a code of student conduct from their current placement to an appropriate interim alternative educational setting, another setting, or suspension, for not more than 10 school days." *Id.* § (k)(1)(B). In such disciplinary situations, school officials may remove a child from her "current placement," provided that the child shall "continue to receive educational services . . . so as to enable the child to continue to participate in the general education

curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP." *Id.* §§ (k)(1)(D) and (k)(1)(D)(i). Section 1415(k)(1)(G) sets forth the instances when a child may be removed to "an interim alternative educational setting" for a longer period of time, such as when the child "carries or possess a weapon to or at school." *Id.* § (k)(1)(G)(i). In § 1415(k)(3), provisions are made for appeals by the child's parent "or a local educational agency that believes that maintaining the current placement of the child is substantially likely to result in injury to the child or to others[.]" *Id.* § (k)(3)(A). Clearly, the term "placement" in subsection (k) refers, at least in part, to a physical location.

Thus, in context, the word "placement" is used in § 1415 to refer to the physical location or surroundings at which a child is receiving educational services and not just the general setting provided for in the student's IEP. This contextual review belies the defendant's argument that "educational placement" refers *only* to the student's IEP without regard to the location where the services identified in the IEP are provided.

       c)    *Meaning of "Educational Placement" In Caselaw*

The defendant correctly points out that the construction it urges has found support in case law from several circuits, including the D.C. Circuit. *See* Def.'s Opp'n at 6 ("This correct application of the term educational placement is well-established and accepted by the courts.").[9]

_____

[9] The defendant also relies on the U.S. Department of Education ("DOE")'s comments in a Federal Registry filing from 2006 and a letter requesting clarification from the Department from 2007. *See* Def.'s Opp'n at 6 (citing Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities ("Assistance to States"), 71 Fed. Reg. 46,540, 46,88 (Aug. 14, 2006) and Letter to Trigg, 50 IDELR 48 (Nov. 30, 2007)). Neither authority addresses explicitly the meaning of "then-current educational placement" in the stay-put provision, nor is either authority particularly helpful to the defendant's construction of this term. While, as the defendant points out, Letter to Trigg states that "school administrators should have the flexibility to assign the child to a particular school or classroom, provided that determination is consistent with the decision of the group determining placement[,]" Letter to Trigg at 2, the same letter uses "placement" and "location" interchangeably, *see id.* at 1 (using placement to refer, in part, to the location of services in noting that "a child's placement must be determined at least annually, be based on the child's individualized education program, *and be as close as possible to the child's home,*" (emphasis added)); *id.* at 2 ("Public agencies are strongly encouraged *to place* a child with a disability *in the school and classroom* the child would attend if the child did not have a disability." (emphasis added)). The Federal Register section quoted by the defendant uses virtually identical language to the previously

13

Yet, two leading cases opining on this question do not support the defendant's near absolutist interpretation of the term "educational placement," and a third directly contradicts the defendant's definition in favor of a more nuanced approach.

In *Lunceford v. District of Columbia Board of Education*, 745 F.2d 1577, 1579 (D.C. Cir. 1984), the court considered the definition of "educational placement" for "a multi-handicapped young man with profound mental [disability] and crippling conditions." The student lived in a private hospital where he was also provided educational services. *Id.* The dispute arose when the private hospital informed the school district that the plaintiff "was ready to be discharged" and recommended that he continue the identical "education program on an outpatient basis." *Id.* The only change at issue in *Lunceford* was the student's residential setting, not his IEP or any other aspect of his educational setting. *See id.*

The D.C. Circuit overturned the District Court's ruling that this change in residential environment constituted a "change in educational placement." *See id.* This focus on the ultimate "change" under consideration in *Lunceford*—namely, the student's residence—counsels against reading the case as supporting the contention that the phrase "educational placement" may never include a location component. The student in *Lunceford* was to have the same educational services provided at the same location by the same teachers without interruption. *See id.* The locational change being challenged was only in the residential portion of his care, which was to be moved from a private hospital to a public one. *See id.* The sole difference between the residential environment at the private hospital and the public hospital at issue was "the feeding treatment [the plaintiff would] receive" at the public hospital. *Id.* at 1582. Even this difference

---

quoted portions of Letter to Trigg. *See* Assistance to States, 71 Fed. Reg. at 46,588. The fact that these DOE documents use the term "placement" and "educational placement" to refer to the location where an IEP is to be implemented, undermines the meaning urged by the defendant that these terms are confined to the goals articulated in the IEP rather than including a physical location. *See* Def.'s Opp'n at 5.

was only one of degree, prompting the D.C. Circuit to observe that the plaintiff "contends only that the overworked [public hospital] staff cannot administer its feeding program *as well as* [the private hospital] administers its program." *Id.* (emphasis added). This minor difference was, according to the *Lunceford* court, sufficient to be "the subject of a complaint and hearings under" the IDEA's predecessor statute, "[b]ut it is not alone sufficient to constitute a change in educational placement, requiring the [defendant] to keep [the plaintiff] at [the private hospital] or a comparable facility until hearings are completed." *Id.* at 1582–83.

The *Lunceford* court reached its decision, in part, by interpreting an earlier Second Circuit case, *Concerned Parents and Citizens for the Continuing Education at Malcom X (PS 79) v. New York City Board of Education* (*Concerned Parents*), 629 F.2d 751 (2d Cir. 1980). *See Lunceford*, 745 F.2d at 1582. Both cases involved a location shift without any change in the operative IEP for the children at issue. *Concerned Parents* rejected an attempt by the parents of nearly two hundred IDEA-eligible students to prevent the New York City Board of Education ("the Board") from closing a certain public school,[10] which the Board said was necessary for budgetary reasons. 629 F.2d at 752. The Board attempted to disperse the students to other schools in the same district "with teachers and their classes being kept intact as much as possible." *Id.* The District Court found that the closing of the school, which had an "extremely innovative educational program" for special needs students, violated the IDEA's predecessor statute and ordered the Board "to provide the transferred students with a broad array of curricular and extra-curricular programs and services that had previously been available[.]" *Id.* at 752–53.

---

[10] The plaintiffs in *Concerned Parents* "alleg[ed] that the transfer of handicapped students from P.S. 79 had violated the Due Process clause of the Fourteenth Amendment, the [IDEA's predecessor statute], the Rehabilitation Act of 1973, 29 U.S.C. § 794 and various provisions of the New York Education law." *Concerned Parents*, 629 F.2d at 752. The injunctive relief entered by the district court, and vacated by the Second Circuit, was not based on the stay-put provision. *See id.* at 753.

The *Concerned Parents* decision addressed only "the narrow question [of] whether the transfer of handicapped children in special classes at one school to substantially similar classes at other schools within the same school district constitutes a change in 'placement' sufficient to trigger the [IDEA's predecessor's] prior notice and hearing requirements," *id.* at 753, not whether such a transfer constituted a change in the "then-current educational placement," 20 U.S.C. § 1415(j), of the students for the purposes of the stay-put provision.

Based in part on a review of the legislative history of the statute, the Second Circuit observed that "educational placement" referred to whether a student was in "regular classes, special classes, special schools, home instruction, [or] instruction in hospitals and institutions[.]" *Id.* at 754 (quoting 45 C.F.R. § 121a.551 (now 34 C.F.R. § 300.115)). The *Concerned Parents* court inferred from this regulation that "a decision to transfer a handicapped child from a special class in a regular school to a special school would involve the sort of fundamental alteration in the child's education requiring prior parental notification[.]" *Id.* On the other hand, the Second Circuit noted substantial policy reasons as "support [for] a restrictive interpretation of the meaning of 'educational placement[,]'" *id.* at 755, which policy reasons were later echoed by the *Lunceford* court, 745 F.2d at 1582 n.5.

The *Concerned Parents* court rejected the District Court's ruling requiring the school district to provide such services to the transferred students as, *inter alia*, "[a] school book fair," "[a] library trip program," "[d]ance and art festivals," and "[w]eekly radio broadcasts in conjunction with a local radio station[.]" 629 F.2d at 755. Such an order, the Second Circuit found, "would virtually cripple the Board's ability to implement even minor discretionary changes within the educational programs provided for its students . . . . [and] the educational agency would lack any workable standard for assessing whether a particular contemplated

decision might constitute a change in 'educational placement.'" *Id.* The *Concerned Parents* court acknowledged that the defendant "made a good faith effort to preserve intact as far as possible the basic educational programs that the transferred children had formerly enjoyed[,]" and that "the transfer may actually further the statutory goal of integrating handicapped children into the regular educational process." *Id.* at 756; 756 n.6. Consequently, in the circumstances of that case, the Second Circuit held that "the term 'educational placement' refers only to the general type of educational program in which the child is placed," for the purposes of the "prior written notice" requirement in the IDEA's predecessor statute. *Id.* at 756.

The *Concerned Parents* court stated explicitly that its "conclusion *does not mean*, however, that there are no constraints on the power of school boards to close schools and transfer students; we merely hold that *under the facts of this case*," prior written notice to the parents of the affected children was unnecessary. *Id.* (emphasis added). The court also pointed out that the parents of the transferred students were free to seek judicial review of the conditions at the new schools after exhausting their administrative remedies. *Id.*

Both the *Concerned Parents* and *Lunceford* courts avoided a construction of "educational placement" that would require courts to micromanage minute aspects of a school district's curriculum choices regarding IDEA-eligible students and, at the same time, emphasized the fact-specific nature of the inquiry as to whether a proposed change in physical location for implementation of an IEP warranted injunctive relief to stop the school district from taking unilateral action. *See Lunceford*, 745 F.2d at 1582; *Concerned Parents*, 629 F.2d at 756.

Indeed, *Lunceford*, which is the only binding authority cited by the defendant in its briefing on this motion, *see generally* Def.'s Opp'n (citing no D.C. Circuit cases other than *Lunceford* as support for its interpretation of "educational placement"), simply does not support

the defendant's proposition that the term "then-current educational placement," as used in the stay-put provision, focuses solely on the goals set out on paper in the IEP, divorced from the physical location where the IEP is to be implemented. The D.C. Circuit limited the holding of *Lunceford*, pointing out that *in that case* there had been no change in the student's educational placement in terms of either the IEP or the physical site for implementation of the IEP. Moreover, the D.C. Circuit indicated a willingness to consider a student's physical location as part of his educational placement when it expressly declined to rule that a change in residential location with identical educational services could *never* be a change in "educational placement." *See Lunceford*, 745 F.2d at 1582 ("The type of program required by a profoundly handicapped child such as [the plaintiff] is too individualized to enable us to say that a move from one 'residential' placement to another can never be a change in educational placement.").[11] Nor does the case *Lunceford* relied upon, in part, to reach its decision, *Concerned Parents*, support the view that the term "educational placement" is limited to the four corners of the IEP, as the defendant urges here.

Subsequent to the Second and D.C. Circuits opinions in *Concerned Parents* and *Lunceford*, the Seventh Circuit in *Board of Education of Community High School District Number 218, Cook County, Illinois v. Illinois State Board of Education* (*Cook County*), 103 F.3d

_____

[11] *Lunceford* is often cited for the proposition that a change in "educational placement" requires "at a minimum, a fundamental change in, or elimination of a basic element of the education program in order for the change to qualify as a change in educational placement." 745 F.2d at 1582. *See, e.g. Knight by Knight v. District of Columbia*, 877 F.2d 1025, 1029 (D.C. Cir. 1989) (citing *Lunceford* definition of change in educational placement); *Tenn. Dep't of Mental Health and Mental Retardation v. Paul B.*, 88 F.3d 1466, 1474 (6th Cir. 1996) (same); *Aikens v. District of Columbia*, 950 F. Supp. 2d. 186, 191 (D.D.C. 2013) (same); *R.B. ex rel. Parent v. Mastery Charter Sch.*, 762 F. Supp. 2d. 745, 757 n.73 (E.D. Pa. 2010) (same); *Comb v. Benji's Special Educ. Acad.*, 745 F. Supp. 2d. 755, 769–70 (S.D. Tex. 2010) (same); *Millay v. Surry Sch. Dep't*, 584 F. Supp. 2d. 219, 228 (D. Me. 2008) (same); *J.D. v. Manatee Cty. Sch. Bd.*, 340 F. Supp. 2d. 1316, 1319 (M.D. Fla. 2004) (same); *J.S. ex rel. D.S. v. Lenape Reg'l High Sch. Dist. Bd. of Educ.*, 102 F. Supp. 2d. 540, 544 n.4 (D.N.J. 2000) (same); *Cavanagh v. Grasmick*, 75 F. Supp. 2d. 446, 467–68 (D. Md. 1999) (same); *Henry v. Sch. Admin. Unit No. 29*, 70 F. Supp. 2d 52, 60 (D.N.H. 1999) (same); *Cole v. Metro. Gov't of Nashville & Davidson Cty, Tenn.*, 954 F. Supp. 1214, 1220 (M.D. Tenn. 1997) (same). This *Lunceford* language does not foreclose consideration of the physical location where a student receives educational services as part of determining whether a "fundamental change" in educational placement has occurred.

545, 548 (7th Cir. 1996), acknowledged that the application of the stay-put provision is an intensely fact-driven inquiry.  The *Cook County* court aptly observed that, since "the term 'educational placement' is not statutorily defined . . . identifying a change in this placement is something of an inexact science."  *Id.*  The Seventh Circuit noted that "the meaning of 'educational placement' falls somewhere between the physical school attended by a child and the abstract goals of a child's IEP."  *Id.*  The plaintiff's argument in the instant matter appears to fall at one extreme of the Seventh Circuit's continuum, namely, that a placement must involve a location, *see* Pl.'s Reply at 4, and the defendant's argument falls at the other end, namely, that a student's placement is merely the abstract goals embodied in an IEP, *see* Def.'s Opp'n at 6.  In *Cook County*, the Seventh Circuit followed an approach that neatly splits the difference between these two extremes.

At issue in *Cook County* was a child whose residential placement had effectively expelled him and a school district that was unable to find another residential program that was able to execute the child's IEP and willing to accept the child.  *See Cook County*, 103 F.3d at 547.  The court affirmed the lower court's issuance of a preliminary injunction mandating that the school district pay for the student's residential placement at a school identified by the child's parents. *See id.*  In reviewing the caselaw from other circuits, the *Cook County* court determined that the term "educational placement" had different meanings in different situations.  *See id.* at 548.  For instance, when "children are moved from a school because of external factors, rather than their own behavioral problems," the Seventh Circuit found that most courts followed the Second Circuit's lead in *Concerned Parents*.  *See id.*  Alternatively, "where a child has been expelled, courts have construed 'educational placement' much more narrowly by looking to the specific institution."  *Id.*  Thus, the Seventh Circuit held that "where expulsion is at issue, a change of

school is interpreted as a change in placement," whereas when "fiscal concerns cause a student to be transferred," a "looser interpretation of placement is appropriate." *Id.* at 549. The court found that such a flexible definition was in keeping with the IDEA's predecessor's "original purpose" to "prohibit schools from excluding from the classroom difficult disabled children." *Id.* Consequently, the Seventh Circuit held that "the outer parameters of 'educational placement' [are] something more than the actual school attended by the child and something less than the child's ultimate educational goals." *Id.* Indeed, many of the D.C Circuit cases interpreting the IDEA since *Lunceford* have used the term "placement" interchangeably with the term "location." *See, e.g.*, *Branham v. Gov't of the Dist. of Columbia*, 427 F.3d 7, 9 (D.C. Cir. 2005) (referring to "private-school placement"); *Holland v. District of Columbia*, 71 F.3d 417, 424 (D.C. Cir. 1995) (using term "placement" to refer to specific school in evaluating appropriateness of placement); *Knight by Knight v. District of Columbia*, 877 F.2d 1025, 1029 (D.C. Cir. 1989) (referring to "public placement" and "private placement" when referencing public and private schools);

This approach has the advantage of using, at its core, a pragmatic assessment of a student's individual circumstances in order to effectuate the stay-put provision's goal of "adher[ing] to the educational status quo for a growing, learning" student. *Cook County*, 103 F.3d at 549. Several other Judges on this Court have relied upon *Cook County*, at least in part, in deciding the applicability of stay-put injunctions. *See Laster*, 394 F. Supp. 2d. at 64–65 (quoting *Cook County*, 103 F.3d at 548); *Vinyard*, 901 F. Supp. 2d. at 85 (quoting *Johnson v. District of Columbia*, 839 F. Supp. 2d. 173, 176–77 (D.D.C. 2012) (citing *Cook County*, 103 F.3d at 548)); *Alston*, 439 F. Supp. 2d 86, 90 (D.D.C. 2006) (quoting *Cook County*, 103 F.3d at 548); *Spilsbury v. District of Columbia*, 307 F. Supp. 2d. 22, 26–27 (D.D.C. 2004) (relying, in part, on *Cook County*, 103 F.3d at 549, for proposition that "'current educational placement'

cannot be read to only indicate which physical school building a child attends," and distinguishing between "current placement," referring to location, and "current level of services," referring to educational programming); *but see D.K. v. District of Columbia*, No. 13-110, 2013 WL 5460281, at *5 (D.D.C. Oct. 2, 2013) (citing *Laster*, 394 F. Supp. 2d. at 64–65 (citing *Cook County*, 103 F.3d at 548) but stating "[A] change of location does not constitute a change in 'educational placement' under the IDEA.").

Set against this review of the facts and policy considerations driving the decisions in *Lunceford*, *Concerned Parents*, and *Cook County*, the Court now turns to a review of the defendant's arguments and authorities.  The defendant, while vigorously asserting that "educational placement does not refer to the school location," Def.'s Opp'n at 6, relies on a number of cases it portrays as supporting its position that, on their face, are simply inapposite. For instance, *Aikens v. District of Columbia*, 950 F. Supp. 2d. 186, 190 (D.D.C. 2013), *James v. District of Columbia*, 949 F. Supp. 2d. 134, 137 (D.D.C. 2013), *Garmany v. District of Columbia*, 935 F. Supp. 2d. 177, 180 (D.D.C. 2013), and *A.M. v. District of Columbia*, 933 F. Supp. 2d. 193, 197 (D.D.C. 2013), did not involve the application of the stay-put provision. Moreover, several of the cases the defendant cites in support of its interpretation, while adopting the defendant's reading of the term educational placement, still engaged in a fact-intensive inquiry into the student's individual circumstances before deciding whether that student was the subject of a change in his "then-current educational placement."  *See, e.g.*, *Johnson*, 839 F. Supp. 2d. 173, 179 (D.D.C. 2012) (noting school district proposed to keep student "at the same physical location with the same IEP that was in place when [the student's] parent filed the pending due process complaint"); *D.K.*, 2013 WL 5460281, at *56 (stating change in location

insufficient to trigger stay-put rights but noting maintenance of "then-current educational placement" would result in denial of FAPE).[12]

The plaintiff argues that "'placement' includes a particular, actual school," Pl.'s Reply at 4, but such a definition is also incomplete. It is entirely possible that a change in an IEP, without a proposed change in the physical location where educational services are to be rendered, may constitute a change in "educational placement" such that the stay-put provision is triggered. *See F.S. ex rel. Snyderman v. District of Columbia*, No. 06-923, 2007 WL 1114136, at *5 (D.D.C. Apr. 13, 2007) (holding that school district's "decision to cut off funding for [the student's] education constitutes a unilateral change in placement that is prohibited by the stay put provision"); *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 194 (2d Cir. 2012) (finding that failure to provide one-on-one instruction with dedicated aide, as provided in student's IEP, was violation of IDEA). As these cases make clear, a change in educational placement does not *always* involve a change in physical location, as the plaintiff suggests. *See* Pl.'s Reply at 4. While a change in physical location may—and often will be—sufficient to trigger the stay-put provision's protections, *Concerned Parents* and *Lunceford* make clear that not every physical location change amounts to a change of educational placement.

*       *       *

To sum up, the location where educational services are to be implemented is a vital portion of a student's educational placement, contrary to the defendant's argument. Yet, the rigid view, put forward by the plaintiff, that a change in physical location is always a necessary and sufficient condition to trigger the stay-put provision is also incomplete. Absent binding

_____

[12] The defendant also relies heavily on cases from the Fifth and Second Circuits that, in turn, rely on *Concerned Parents* and *Lunceford*. *See* Def.'s Opp'n at 6–8 (citing, *inter alia*, *White ex rel White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 379 (5th Cir. 2003) and *T.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009)). As previously noted, neither *Lunceford* nor *Concerned Parents* support the defendant's interpretation.

precedent from the D.C. Circuit, the Court finds the Seventh Circuit's reasoning in *Cook County* persuasive and holds that the term "educational placement" in the IDEA does mean "something more than the actual school attended by the child and something less than the child's ultimate educational goals," and can include both the physical location of educational services and the services required by the student's IEP. *See Cook County*, 103 F.3d at 549.

This does not end the inquiry, however, since it is still necessary to determine the plaintiff's "then-current educational placement" at the time the instant appeal was raised and whether the change proposed by the school district is, in fact, a change in the then-current educational placement.

### B.     TLCIS Is The Plaintiff's "Then-Current Educational Placement" For The Purposes Of The Stay-Put Provision

The plaintiff contends that his "then-current" placement is the school from which he has been receiving instruction since 2010-2011, namely, TLCIS. Pl.'s Mem. at 8. The defendant argues that TLCIS has never been the plaintiff's "placement." *See* Def.'s Opp'n at 16 ("[T]he Court should reject Plaintiff's argument that TLCIS is his current educational placement for purposes of "stay put"). Instead, the defendant suggests that High Road Academy, the school the plaintiff has never attended and was not identified as the plaintiff's placement until February 5, 2014, after the instant due process complaint was filed, *is* the plaintiff's placement. *See id.* at 11 (arguing no change in educational placement since High Road Academy can purportedly implement the plaintiff's IEP. The Court finds that TLCIS is the plaintiff's "then-current educational placement" for the purposes of the stay-put provision and rejects the defendant's arguments to the contrary.

In *District of Columbia v. Oliver*, No. 13-215, 2013 WL 6000889, at *3 (D.D.C. Nov. 13, 2013), this Court addressed an analogous situation to the instant matter. In *Oliver*, the school

district refused to provide an IEP for a student before that student first enrolled in a public school. *See id.* at *1. When the student asserted her stay-put rights, the school district argued that, absent an IEP, there could be no "then-current educational placement" to maintain. *See id.* at *3. Although the instant matter differs from *Oliver* in that the plaintiff here has an IEP, the same principles of law from *Oliver* apply to show that TLCIS is the plaintiff's "then-current educational placement" for stay-put purposes.

As this Court noted in *Oliver*, "[w]here . . . no IEP has been prepared or implemented, the 'current educational placement' will be the place where the child is actually receiving instruction at the time the dispute arises, provided there has been some sort of administrative determination that the location is appropriate." *Id.* (collecting cases). While the plaintiff in the instant matter has an IEP, that IEP has never been implemented by the defendant and the plaintiff has received instruction under the May 2013 IEP exclusively from TLCIS. *See* Pl.'s Mem. at 4–5. Thus, if there has been "some sort of administrative determination that the location is appropriate" at TLCIS, then TLCIS is the plaintiff's "then-current educational placement" for the purposes of the stay-put provision. *See Oliver*, 2013 WL 6000889 at *3.

The defendant contests the plaintiff's assertion that "every adjudicator to address the issue has found TLCIS appropriate for him." Pl.'s Mem. at 5; *see* Def.'s Opp'n at 12 ("[N]o hearing officer or court has agreed with Plaintiff that TLCIS is Plaintiff's educational placement, but they have ordered reimbursement."). The defendant's argument appears to elevate form over substance: since none of the prior adjudications that found the defendant denied the plaintiff a FAPE have ordered that the plaintiff be placed at TLCIS indefinitely, the defendant contends that none of them have explicitly stated TLCIS is the plaintiff's "educational placement." *See* Def.'s Opp'n at 11–16. The record does not support the defendant's view.

Setting aside the multiple HODs that have ordered reimbursement of the plaintiff's expenses for attending TLCIS since 2010, this Court found TLCIS an "appropriate placement" in upholding an earlier HOD in *Eley I*. Specifically, this Court noted "[t]he private school placement [at TLCIS] *was deemed appropriate* . . . according to the hearing officer." *See Eley I*, 2012 WL 3656471, at *3; *see also* Pl.'s Ex. 1 at 2 (referring to HOD stating the *Eley I* "Court did not disturb the original hearing officer's finding that [TLCIS] was appropriate."). As such, there has been an "administrative determination that the location is appropriate." *See Oliver*, 2013 WL 6000889 at *3. The cases relied upon by the defendant that address situations where there has been no determination that the current educational placement was appropriate are wholly inapposite. *See* Def.'s Opp'n at 12–14 (relying upon *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 909 (9th Cir. 2009) and *Huerta v. San Francisco Unified Sch. Dist.*, No. 11-4817, 2011 WL 5521742, at *6 (N.D. Cal. Nov. 14, 2011)).[13]

The next necessary determination is whether a shift from TLCIS to High Road Academy is, in fact, a change in educational placement. That it is such a change is clear from the defendant's characterization of the two schools. The defendant notes that TLCIS, which has been found appropriate by previous HODs and this Court, *see Eley I*, 2012 WL 3656471, at *3; *see also* Pl.'s Ex. 1 at 2, is "an internet school with . . . no campus or physical classroom [and] no access to other peers in the educational setting," Def.'s Opp'n at 5. High Road Academy, on the other hand, "is a specialized school for students with learning disabilities . . . [that] offers a small-group setting, one-on-one instruction . . . . [where a]ll classes are led by a certified teacher

---

[13] The defendant also argues that, under D.C. Code § 38-2561.03, TLCIS could not be found to be the plaintiff's educational placement since the school is not on the list of special education schools certified by the D.C. Office of the State Superintendent of Education. *See* Def.'s Opp'n at 15–16. This contention is ultimately irrelevant, since the only question at issue is where the plaintiff is currently receiving the educational services mandated by his IEP. *See supra*. Additionally, the Supreme Court has made clear that parents are entitled to reimbursement for placements even if such a placement is not on a school board's certified list of eligible schools, as long as the placement to be reimbursed is appropriate. *See Florence Cty. Sch. Dist. Four v. Carter By and Through Carter*, 510 U.S. 7, 11, 14 (1993).

and a teaching assistant with a reading specialist who works closely with the teachers," Def.'s Opp'n at 10–11 (first alteration in original).  Clearly, shifting from what is essentially a completely individualized instructional setting separate from other students to a more traditional school setting does constitute a change in the plaintiff's "then-current educational placement," as defined *supra*, such that the plaintiff is entitled to the stay-put provision's presumption of automatic injunctive relief.[14]

### C.     Application of Traditional Preliminary Injunction Four-Factor Test

The defendant contends, in the alternative, that the presumption in favor of the plaintiff's requested injunctive relief under the stay-put provision is overcome in the instant matter because the "application of the traditional four part preliminary injunction test warrants a different result."  Def.'s Opp'n at 17.  At the outset, the defendant has made no separate, counter-motion for a preliminary injunction to enjoin enforcement of the stay-put provision and, consequently, the propriety of considering the traditional four-factor test for injunctive relief is procedurally questionable here.  The law is well-settled that a student invoking the stay-put provision need not address these factors.  *See Laster*, 439 F. Supp. 2d at 98–99 (collecting cases).  By contrast, a school district seeking to change the status quo must make the requisite showing of meeting the four-factor test in order to displace the then-current educational placement protected by the stay-put provision.  *See Honig*, 484 U.S. at 328 (discussing application of four-factor test to school district requests for injunctive relief to change status quo placement of disabled student); *see also*

---

[14] The plaintiff's IEP is silent regarding any school that could provide the services the plaintiff requires.  *See generally* AR at 102–124 (Plaintiff's May 2013 IEP).  Thus, offering the student a specific location for services where none had previously been identified or provided by the defendant would, in and of itself, represent a "change in educational placement."  To decide otherwise would, as the plaintiff points out, give the defendant virtual "unilateral power over school choice" and enable the defendant to move students from school to school without parental input and without any opportunity for the parent to prevent the change in status quo through the stay-put provision.  *See* Pl.'s Reply at 5–6.  Thus, the defendant's argument that offering, for the first time, a location at which the plaintiff could receive the services mandated by his IEP, when he had been receiving services elsewhere for the past four years, is plainly a "change in educational placement," since it is a change from no location for services to an actual location for services.

*Bell v. Educ. in the Unorganized Terrs.*, No. 00-CV-160-B, 2000 U.S. Dist. LEXIS 15262, at *9–17 (D. Me. Oct. 16, 2000) (holding where student invoked stay-put provision, defendant school authorities have burden "to move for a preliminary injunction and to make the requisite four-part showing" to prevent the student from remaining in school); *School Bd. of Pinellas Cty., Fla. v. J.M. By and Through L.M*., 957 F. Supp. 1252, 1253–1254 (M.D. Fla. 1997) (noting where student objected to proposed change in placement and invoked stay-put provision, school board sought "injunction enjoining the enforcement of this 'stay-put' provision").

The First Circuit made this mechanism explicit in *Doe v. Brookline School Committee*, 722 F.2d 910, 917 (1st Cir. 1983), noting that the "motion for preliminary injunction should be made by the party wishing to depart from the status quo." Here, that party is the defendant, which is seeking a change in the plaintiff's current placement and, therefore, the defendant should be the one required to move for a preliminary injunction. *See id.* The First Circuit explained that the policy considerations underlying this procedural requirement were to effectuate Congress' "strong preference for the preservation of the status quo through its enactment of [the stay-put provision]," and to "maintain the court's broad equity powers to do substantial justice[,]" *id.*, by not rewarding school systems "for their misfeasance or nonfeasance . . . . in contravention of the statute's express primary directive[,]" *id.* at 916, to provide a FAPE to all students. While the stay-put provision does not "limit the equitable powers of district courts," *Honig*, 484 U.S. at 327, the burden of invoking those equitable powers lies with the party attempting to change the status quo, and "such a motion should be decided on the basis of the 'traditional criteria,'" for a preliminary injunction, *Doe*, 722 F.2d at 917. Thus, the defendant's attempt to obtain what is, in essence, an injunction against application of the stay-put

provision through its opposition brief is an end-run around the procedural mechanism of a separate motion for such relief that would normally be required.

In light of the plaintiff's failure to object to the appropriateness of the defendant's procedural short-cut, however, the Court turns to the defendant's argument regarding application of the traditional four-factor test for invocation of a preliminary injunction. "A [party] seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)) (alteration in original). A traditional preliminary injunction, as opposed to the statutory automatic injunction provided for in the stay-put provision, "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2948 (2d ed. 1995)) (emphasis in original). In this circumstance, the defendant, not the plaintiff, is properly considered the movant. *See Honig*, 484 U.S. at 328 n.10 ("In any suit brought by parents seeking injunctive relief for a violation of [the stay-put provision], the burden rests with the school district to demonstrate that the educational status quo must be altered."). The defendant fails to carry its burden for the extraordinary relief requested.

First, the defendant asserts that the plaintiff's likelihood of success on the merits "is either inapplicable or should be given less weight than the other factors" in this matter, since determining the plaintiff's educational placement is not at issue in the underlying appeal. Def.'s Opp'n at 17. Instead, the defendant relies upon the "sliding scale" approach to preliminary

injunctions, where, even if the movant is unable to show a strong likelihood of success on the merits, the movant may nevertheless be granted injunctive relief if "the other three factors strongly favor interim relief" and "the moving party has merely made out a 'substantial' case on the merits." *See id.* at 17 (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843–45 (D.C. Cir. 1977)). The defendant's argument rests on caselaw that is now the subject of a Circuit split, on which the D.C. Circuit has yet to take a position. *See Sherley*, 644 F.3d at 393. Specifically, there is some question as to whether the "sliding scale" approach asserted by the defendant survives the Supreme Court decision in *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20–21 (2008), which notes that a plaintiff seeking injunctive relief must prove all four prongs of the four-factor test, including likelihood of success on the merits. *See In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013) (requiring proof that all four prongs of preliminary injunction standard be met before injunctive relief can be issued); *Gordon v. Holder*, 721 F.3d 638, 659 (D.C. Cir. 2013) (Kavanaugh, J., concurring in judgment in part and dissenting in part) (noting "a District Court must find a likelihood of success on the merits" before granting preliminary injunctive relief and questioning whether sliding scale remains "viable"). Thus, the defendant's assertion that, in this case, the likelihood of success on the merits prong may be "given less weight than the other factors," Def.'s Opp'n at 17, is simply incorrect as a matter of law.

In any event, substantial questions have been raised in this matter about why the defendant did not identify a location for educational services for the plaintiff until February 2014, despite being ordered to do so by this Court almost eighteen months earlier, in August 2012. *See Eley I*, 2012 WL 3656471, at *11. The defendant does not attempt to address those questions and, instead, relies on an exchange of emails examined in the HOD under appeal to

declare that the defendant is likely to succeed on the merits. *See* Def.'s Opp'n at 18.[15] Such a cursory examination of the likelihood of success on the merits prong is utterly insufficient to establish the proof necessary to warrant the extraordinary relief of a preliminary injunction. Consequently, the Court finds that this factor favors the plaintiff.

Second, the defendant claims that it will suffer irreparable injury because allowing the plaintiff to remain at TLCIS "is a fundamental violation of the IDEA" and, according to the defendant, TLCIS is a more restrictive environment for the plaintiff than High Road Academy. Def.'s Opp'n at 19. This argument fails, since, as noted, multiple HODs and a prior ruling of this Court have determined that TLCIS is an appropriate placement for the plaintiff.[16] In addition, the plaintiff has been receiving educational services from TLCIS since the 2010-2011 school year—since the defendant failed utterly even to designate a school for him to attend until 2014. *See* Pl.'s Mot. at 4–5. Finally, the Supreme Court has previously noted that school districts could be made to reimburse parents for educational expenses incurred at schools that do not meet the requirements of the IDEA if the school district failed to provide an appropriate alternative placement. *See Florence Cty. Sch. Dist. Four v. Carter By and Through Carter*, 510

---

[15] The HOD and the defendant expend a great deal of ink on the plaintiff's alleged lack of cooperation in November and December of 2013 when the defendant had been ordered to identify a school for the plaintiff to attend. *See* AR 352–65 (HOD (Feb. 16, 2013 [sic – should be 2014])) (citing numerous emails between plaintiff and defendant discussing whether defendant would identify school options for plaintiff); Def.'s Opp'n at 17–18 (asserting plaintiff was uncooperative in process of identifying school). This discussion is ultimately irrelevant to resolution of this matter, since it was the defendant's statutory duty to provide a school for the plaintiff to attend, and, as the plaintiff points out, the defendant retained the unilateral power to designate a school, which the defendant did on February 5, 2014. *See* Pl.'s Reply at 13.

[16] Additionally, the May 2013 IEP mandates five hours per week of cognitive skills training. AR at 117. Although the defendant has submitted a verified statement from the Director of High Road Academy that states the school is "capable of implementing" the May 2013 IEP, Def.'s Opp'n Ex. 3 (Verified Statement of Shanon Redman, Director, High Road Academy) ¶ 6, ECF No. 10-3, the plaintiff asserts that the same Director informed the plaintiff in a telephone conversation with plaintiff's counsel that "the school would not provide cognitive skills training with a cognitive skills trainer or coach," Pl.'s Reply at 2 n.2. Thus, there is some question whether High Road Academy is, itself, an appropriate placement that can implement all aspects of the plaintiff's IEP.

U.S. 7, 11, 14 (1993).[17]  Consequently, the defendant's argument that acknowledging the school

from which the plaintiff has been receiving instruction, at the defendant's expense, for the past

four years, and which has been found to be an appropriate placement, would constitute an

irreparable harm by mandating that the defendant "violat[e]" the IDEA is unpersuasive.[18]

The defendant offers no argument whatsoever as to the third factor, regarding the balance

of equities, and the reason for this silence is obvious.  Given the plaintiff's ongoing struggle over

the last four years to obtain a FAPE from the defendant, with the majority of administrative

decisions and Court opinions in the plaintiff's favor, and the long delay until the middle of the

most recent school year in the defendant's designation, for the first time, of a location for

implementation of the IEP, the equities decidedly do not favor the defendant.

Finally, the defendant pays lip service to the fourth factor, whether the injunction is in the

public interest, *see* Def.'s Opp'n at 19, but conflates its discussion of this factor with its

discussion of irreparable harm, *see id.*at 19–21.  The defendant argues that because the IDEA

---

[17] The defendant contends that "with this motion, Plaintiff is not asking for reimbursement for a parental placement. Plaintiff is asking that this Court declare TLCIS to be his educational placement." Def.'s Opp'n at 19.  This is incorrect.  The plaintiff's motion asks only that this Court determine what *was* the plaintiff's "then-current educational placement" for the purposes of § 1415(j), which, as discussed in Part III.B, *supra*, is where the child was receiving educational instruction, provided that such a location had been found "appropriate" by some kind of administrative decision.  *See Oliver*, 2013 WL 6000889, at *3.  Since *Eley I* and prior HODs have found TLCIS to be appropriate, the Court is merely acknowledging what has already been determined by prior administrative decisions to be an appropriate placement in which the plaintiff may receive educational services until his underlying appeal is resolved.

[18] The plaintiff argues that "the cost of TLCIS has repeatedly been implicitly and explicitly approved by hearing officers" and that absent "evidence that TLCIS is significantly more expensive than High Road [Academy], there is no reason to believe that the District is in danger of substantial injury." Pl.'s Reply at 19.  In other words, should the defendant prevail in the underlying appeal, it is unclear how the defendant's costs expended to provide the plaintiff a FAPE at a private school other than TLCIS would change—it is possible those costs would increase.  The defendant makes no reference to this point and, indeed, the relative difference in costs between the two placements at private schools would appear to fall short of establishing any harm to the defendant, let alone irreparable harm.  Not only is it the "general rule that economic harm does not constitute irreparable injury," *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009), but the defendant could be entitled to reimbursement for the costs of preserving the student in his current placement if the defendant prevails in the underlying action, *see Henry*, 70 F. Supp. 2d. at 62 (citing First Circuit precedent and stating parents "will be required to reimburse the School District for all costs that the District incurs in maintaining the placement if it ultimately prevails on the merits").  In these circumstances, the defendants—indeed, any school district's—ability to establish irreparable harm would appear to be extremely difficult, if not impossible.

requires all students to be educated in the "least restrictive environment," Def.'s Opp'n at 19 (quoting 20 U.S.C. § 1412(a)(5)), it is not in the public interest to allow the plaintiff to remain at a placement the defendant asserts is more restrictive than High Road Academy. *See id.* at 22. The defendant offers no authority for why allowing the plaintiff merely to continue receiving educational services where he is already receiving services harms the public interest. Common sense would dictate that if the plaintiff's current educational placement, TLCIS, has been found appropriate, as this Court and multiple HODs have found, then the public interest in providing a FAPE to the plaintiff is furthered by that placement. Therefore, the Court finds that the public interest factor weighs against the defendant and in favor of the plaintiff continuing to receive a FAPE at TLCIS.

The defendant has simply not provided a sufficient showing to warrant the extraordinary and drastic relief embodied in a preliminary injunction, let alone to overcome the presumption in favor of the plaintiff under the stay-put provision. Accordingly, the defendant's request to deny the plaintiff's motion for injunctive relief under the stay-put provision is denied.

## IV.    CONCLUSION

Once again, this Court is called upon to enter an Order to protect the plaintiff's statutory rights under the IDEA. In this instance, the plaintiff's request merely to remain at the same school where he has been receiving instruction for the past four years, at the defendant's expense, is expressly contemplated by the plain text of the IDEA's stay-put provision. The plaintiff's request for injunctive relief under 20 U.S.C. § 1415(j) is granted. The defendant shall fund the provision of instruction and related services prescribed in the plaintiff's May 2013 IEP, at The Learning Community International School, facilitated by School Finders, at their

customary rates, until the pending judicial proceedings regarding the February 2014 HOD are completed.

An appropriate Order accompanies this Memorandum Opinion.

Date: June 4, 2014

_____
BERYL A. HOWELL
United States District Judge